Submitted August 9, affirmed October 16, 2019

## STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

## TONY LAMAR BROWN,
*Defendant-Appellant.*

Multnomah County Circuit Court
16CR55091, 16CR62746;
A165931 (Control), A166092

452 P3d 482

Defendant appeals from a judgment of conviction for first-degree robbery, first-degree burglary, unlawful use of a weapon, strangulation, second-degree kidnapping, and menacing. He assigns error to the trial court's denial of his motion *in limine*, as well as his midtrial objection before the witnesses testified, to exclude evidence that he barricaded himself in the victim's house and that police forcibly entered the house to arrest him after a nine-hour standoff. He also assigns error to the trial court's denial of his subsequent objection under OEC 403 and motion for mistrial, both based on the evidence of the standoff being unfairly prejudicial. *Held*: (1) The trial court's denials of defendant's motion *in limine* and midtrial objection to exclude evidence of the standoff were preliminary and not appealable. (2) The trial court did not abuse its discretion in rejecting defendant's pretrial proposal to limit evidence of the standoff, because the nature and extent of the actions that defendant took to avoid capture bore on the extent to which the jury could infer his guilty knowledge. (3) Defendant's OEC 403 objection and motion for mistrial were untimely, as defendant waited until long after the witnesses had finished their testimony and been excused before objecting to the specific testimony that they offered.

Affirmed.

Leslie G. Bottomly, Judge.

Ernest G. Lannet, Chief Defender, Criminal Appellate Section, and Erica Herb, Deputy Public Defender, Office of Public Defense Services, filed the brief for appellant. On the supplemental brief were Ernest G. Lannet and Andrew D. Robinson, Deputy Public Defender, Office of Public Defense Services.

Ellen F. Rosenblum, Attorney General, Benjamin Gutman, Solicitor General, and Christopher Page, Assistant Attorney General, filed the briefs for respondent.

Before Lagesen, Presiding Judge, and Powers, Judge, and Kistler, Senior Judge.

KISTLER, S. J.

Affirmed.

**KISTLER, S. J.**

Defendant appeals from a judgment of conviction for first-degree robbery, first-degree burglary, unlawful use of a weapon, strangulation, second-degree kidnapping, and menacing. He raises four assignments of error in his opening brief and three additional assignments of error in a supplemental brief. We limit our discussion to the second and third assignments of error in his opening brief and affirm the trial court's judgment.[1]

The victim and defendant had been in a relationship for some time. In 2016, the victim sought to end the relationship, but defendant persisted. He repeatedly drove by the victim's home, telephoned her, and sent her text messages. On three occasions during August and September, defendant took actions that resulted in the convictions he now challenges on appeal. We describe those actions briefly before turning to the trial court's evidentiary rulings that are the subject of defendant's second and third assignments of error.

On August 9, 2016, the victim was at home sleeping on a couch. She woke to find defendant putting a plastic bag over her head. After struggling with defendant, she was able to get the bag off her head. However, once she did so, defendant put a gun initially to her head and then in her mouth. He accused her of seeing other men and told her that he was going to kill her. He said that he was going to put her body in the plastic bag and bury her where no one would find her. At first, the victim told defendant that she was not seeing anyone. Later, she "started agreeing to what he was saying, because[, as the victim put it,] the truth wasn't working." When she began "admitting" his accusations, defendant calmed down. He left the living room briefly, which allowed the victim to text her adult daughter to call the police. Defendant became suspicious that the victim had contacted the police and fled from the house when officers knocked on the front door.

---

[1] We affirm without discussion defendant's remaining assignments of error in his opening brief. We reject on the merits the three assignments of error relating to the nonunanimous jury verdict in this case that defendant raises in his supplemental brief.

After that attack, the victim stayed in her mother's house because she "was too scared to go back" to her own home. However, on August 22, the victim went back to her home with four members of her family. She wanted to gather some clothes and secure the house to keep defendant from getting inside. When they were inside the home, they "smell[ed] smoke. It just didn't seem right. It felt like he * * * might have just been there." They looked for defendant but did not find him. Then, the victim's daughter went over to a couch by the window. When she did so, the couch moved, defendant jumped out from behind the couch, brandished a gun, and threatened to kill the victim. When the victim's uncle and her daughter confronted defendant, he ran out the back of the house.

After those two encounters, defendant continued to telephone the victim, and the victim continued to talk with him. During one of their calls, he offered to meet her in a public place to help her with her car. He told her that another person would be there to calm any fears she might have. Initially, the victim resisted. Later, she relented. On September 7, the victim drove her car to a public parking lot where she met defendant. The third person was not there. Defendant got in the backseat of the victim's car and told her to drive to a city park. When the victim's cell phone rang, defendant told her not to answer it, put a knife to her throat, and once more accused her of seeing other men.

When they got to the park, the victim began driving her car into parked cars, hoping that someone would call the police. During the ensuing confusion, the victim tried to escape. Defendant, however, managed to get into the front seat and grab the victim's braids before she could get completely out of the car. He drove off, holding the victim by her braids and dragging her along the road for several feet until her braids broke.

That night, defendant abandoned the victim's car, broke into her house, and barricaded himself inside. The next day, the police discovered him in the house, which led to a nine-hour standoff during which the police initially tried to get defendant to give himself up and later forcibly entered the house and placed defendant under arrest. The trial

court's rulings admitting evidence regarding the standoff are the subject of defendant's second and third assignments of error, which raise related but separate issues.

## I.   DEFENDANT'S SECOND ASSIGNMENT OF ERROR

Before trial, defendant filed a motion *in limine* arguing that any evidence regarding the standoff should be limited under OEC 403. In addressing that motion, the trial court issued what it described as a preliminary ruling; it provided general guidelines for the parties to follow, and it expressly advised defendant that he should object at trial if the evidence of the standoff became either cumulative or unduly prejudicial. At trial, defendant renewed his motion *in limine* before any testimony regarding the standoff was offered, and the trial court reaffirmed its pretrial ruling. Three witnesses then testified about the standoff without further objection. Some time after the trial had moved on to other matters, defendant raised an OEC 403 objection to the standoff testimony that the three witnesses previously had offered. The trial court overruled that objection.

On appeal, defendant appears to assign error to each of those rulings.[2] In arguing that the trial court erred in making those rulings, defendant treats the three rulings as if they were synonymous. However, the record before the trial court when it made the rulings and the substance of those rulings differ. Beyond that, each ruling arose in a different procedural posture. For that reason, we discuss each ruling separately. *See Strawn v. Farmers Ins. Co.*, 350 Or 336, 347-50, 258 P3d 1199, *adh'd to on recons*, 350 Or 521, 256 P3d 100 (2011), *cert den*, 565 US 1177 (2012) (explaining the need to focus on the specific arguments raised and the precise evidentiary rulings); *Hayes Oyster Co. v. Dulcich*, 170 Or App 219, 224, 12 P3d 507 (2000) (same).

---

[2] We say "appears" because defendant's second assignment of error states generically that "[t]he trial court erred when it admitted evidence of defendant's standoff with police before his arrest." Although defendant's assignment of error does not identify the specific ruling or rulings that he contends were erroneous, *see* ORAP 5.45(3) (requiring that each challenged ruling be specifically identified), the preservation section of his brief sets out the three evidentiary rulings described briefly above. We assume that defendant challenges each of those rulings.

A.  *Defendant's Pretrial Motion* in Limine

Before trial, defendant filed a motion *in limine* to exclude evidence regarding the standoff. In making that motion, defendant acknowledged that a limited amount of evidence regarding the standoff was admissible to prove his guilty knowledge. Specifically, defendant acknowledged that the state could "confirm that * * * [defendant] did not cooperate, that he refused to come out, [and that] they had to forcibly remove him." However, defendant argued that anything other than that brief, schematic description of the standoff would be unduly prejudicial and violate OEC 403. The state, for its part, recognized that not all the evidence regarding the standoff should be admitted, but it argued that more information than defendant would admit was relevant to prove defendant's guilty knowledge.

As the parties' discussion progressed, their positions shifted slightly. In part, that shift derived from the fact that defendant did not know the specific evidence that the state sought to admit. When he filed his pretrial motion *in limine*, he was aware only of the people on the state's witness list whom it intended to call, and he could only speculate about the evidence the state would seek to admit. In part, the parties' positions appear to have changed because each side saw some value in the other's arguments and modified their positions accordingly. Defendant, for example, acknowledged that the officers could add that defendant had been found in the victim's home. The state, for its part, offered to limit the number of witnesses to avoid focusing too much on the standoff.

Despite some movement on both sides, the parties were unable to agree on which of the events that occurred during the nine-hour standoff should be admitted, nor could they agree on the extent to which the witnesses could testify about those events. Faced with that division, the trial court announced what it described as a "preliminary ruling." It advised the parties that it had "concerns about the quantum and character of the evidence at some point crossing the line from being probative to being prejudicial." It recognized that the "evidence of flight and resisting apprehension clearly is relevant to guilty knowledge." It also recognized,

however, that "[t]ypically cases involve fleeing police and being apprehended. They don't include [a] nine hour stand-off, CERT Team, C.N.T. Team, C.I.C Team, tear gas, tasing, [and] robots." The court accordingly asked

"the State to make its way through this testimony quickly and without cumulative coverage of things, without hysteria, without officers testifying that there was a statement to the effect that 'I've never seen somebody not respond to this much gas,' or 'I've never seen somebody go so long.' That statement particularly, that's a lot of facts not in evidence that doesn't [*sic*] have anything to do with this case, so if there was an officer who was going to testify something to that effect, I think that goes beyond what would be appropriate."

In providing that guidance, the court acknowledged that "this is a difficult [case] for the State to know where the Court's at on this." The court then advised defense counsel, "If objections are raised I may advise the State it's time to move on, that that topic has been covered if I feel that it's reaching a point of being cumulative or overly emphasizing beyond the probative value of the Defendant's quote/unquote guilty knowledge, evidence[d] by fleeing and resisting arrest."

Following that admonition, the parties discussed briefly whether the amount of tear gas that defendant tolerated could be separated from the amount of illegal drugs in his system, both of which potentially were relevant to his mental and physical state when he subsequently confessed. After defendant acknowledged that the state could mention the amount of tear gas used, the court sought to clarify defendant's position. The trial court observed, "So they can say he handled a lot of gas. I just don't want them saying of the 200 standoffs * * * this one [was] the worst." Defense counsel interjected, "Right."

The court then restated its ruling:

"[H]ere's my preliminary ruling. * * * I'm not excluding anything at this point, but I'm giving the State fair warning that if the State chooses to dwell on, repeat, overly emphasize with their questioning, their length of time [that] they have these CERT officers on the stand, they risk me deciding okay, you've made your point, right? Guilty mind. He

was fleeing, he was resisting, point made. Anything beyond that is going to be prejudicial."

As the court's statements made clear, it was not excluding anything "at this point." It wanted to see how the evidence played out. It also made clear that it did not want the state to dwell on the evidence and advised defendant that, "[i]f objections are raised," it would exclude cumulative or prejudicial testimony.

Defendant assigns error to that ruling, which the trial court twice described as "preliminary." Defendant's assignment of error faces a potential hurdle, however. Following the Supreme Court's lead, we have long held that a party may not assign error to a preliminary evidentiary ruling. *Hayes*, 170 Or App at 233-34; *State v. Jackson*, 68 Or App 506, 512-13, 683 P2d 120, *rev den*, 297 Or 546, *cert den*, 469 US 983 (1984); *accord State v. Adams*, 296 Or 185, 189, 674 P2d 593 (1983). In *Jackson*, we explained that, when the trial court's ruling was anticipatory and merely revealed the trial court's inclinations, the ruling could not be challenged on appeal; counsel needed to do something more to give rise to a final appealable ruling, such as offer or object to specific evidence at trial. 68 Or App at 513. Similarly, we explained in *Hayes* that "'the trial court's subjective statement[s] of its anticipated ruling[s],' which the trial court expressly made subject to further consideration at trial" were not final rulings that could be challenged on appeal. 170 Or App at 233 (quoting *Adams*, 296 Or at 189 (bracketed material added in *Hayes*)).

For the most part, the trial court's ruling on defendant's pretrial motion *in limine* was, as the trial court described it, preliminary. However, the trial court's ruling was final in one respect. It is clear from the trial court's comments that it rejected defendant's efforts to limit evidence regarding the standoff to his proposed schematic description of the event, which we refer to as defendant's proposed "stipulation."[3]

---

[3] The state argues that defendant never formally stipulated to the admission of particular evidence. That may be correct. However, even if we assume that defendant's schematic, minimal description of the admissible evidence constituted a "stipulation," the trial court did not err in declining to limit the state to defendant's stipulation for the reasons explained below.

In that limited respect, the trial court's ruling was final, and we turn to that aspect of the trial court's ruling.

On appeal, defendant argues that the trial court abused its discretion in rejecting his proposed stipulation. The validity of defendant's argument turns initially on whether the state's proffered evidence was relevant to prove more than the limited "stipulation" that defendant urged was sufficient to prove the state's case. *See State v. Sparks*, 336 Or 298, 309-12, 83 P3d 304, *cert den*, 543 US 893 (2004) (concluding that, because post-mortem photographs were relevant to prove more than the defendant stipulated, the trial court did not err in declining to limit the state to the defendant's stipulation). We cannot say that the trial court erred in declining to accept defendant's stipulation.

The nature and extent of the actions that defendant took to avoid capture bore on the extent to which the jury could infer his guilty knowledge. *See State v. McCormick*, 280 Or 417, 420-21, 571 P2d 499 (1977) (explaining that the question whether an inference of guilty knowledge should be drawn from a defendant's actions and the strength of that inference will vary with the facts in each case). The trial court reasonably could conclude that defendant's abbreviated version of the facts would not give the jury a sufficient evidentiary basis from which to draw (or not draw) an inference concerning his guilty knowledge. Moreover, the duration of the standoff and the physical and mental stresses arising from the standoff bore on the validity of his confession following his arrest.[4] To be sure, too great a focus on the details of the standoff could become unduly prejudicial, as the trial court recognized. However, we cannot say that the trial court abused its discretion in declining to limit the evidence

---

[4] There was no evidence before the trial court when it ruled on defendant's pretrial motion, only the representations of the parties. The state represented (and defendant did not dispute) that, because defendant "does give an interview *** after his arrest, the jury would be able to consider whether or not he was under the influence of any intoxicants and that sort of thing." The trial court discounted the state's focus on defendant's mental and physical state as raising a separate issue. However, the effect of the prolonged standoff and defendant's extended exposure to the tear gas bore on his physical and mental state when he confessed after his arrest. Defendant's proposed stipulation was not sufficient to provide the jury with a complete basis for assessing his mental and physical state.

regarding the standoff to the abbreviated schematic version of the events in defendant's proposed stipulation.[5]

We accordingly affirm the one aspect of the trial court's ruling on defendant's pretrial motion *in limine* that is final. Beyond that, however, the trial court's ruling was, as the court twice described it, preliminary. That is, the trial court declined to rule pretrial on the specific evidence of the standoff that would and would not be admissible. Instead, it identified general guidelines that the state should follow in eliciting the evidence, and it advised defendant that, "[i]f objections are raised," it would exclude cumulative or prejudicial testimony. That aspect of the trial court's ruling on his pretrial motion was not final, and his challenge to that part of the trial court's pretrial ruling is not properly before us. *See Hayes*, 170 Or App at 233-34; *Jackson*, 68 Or App at 513.

## B. *Midtrial Ruling*

After the trial court ruled on defendant's pretrial motion *in limine*, the case proceeded to trial. The state called witnesses who testified regarding defendant's assaults on August 9, August 22, and September 7. It then called three witnesses to testify regarding the standoff: Officers King, Sparling, and Chamberlin. King began his testimony by stating that his "full-time job [was to] run the crisis negotiation team for [the] Portland Police." At that point, before King had offered any specific evidence about the standoff, defense counsel renewed his pretrial motion *in limine*:

---

[5] In arguing that the trial court abused its discretion in not accepting his proposed stipulation, defendant contends that, in light of the evidence that he had fled on August 9 and 22, the evidence of his resistance on September 8 was only marginally relevant to proving his guilty knowledge. That argument is problematic for three reasons. First, when the trial court ruled on defendant's pretrial motion, there was no evidence (or representation) that defendant had fled on August 9 and 22. Second, and more importantly, defendant's flight on August 9 and 22 permitted the jury to draw an inference of guilty knowledge regarding his acts on those days, but his flight on August 9 and 22 provided no basis for inferring guilty knowledge regarding his acts on September 7. Finally, the defendant's stipulation (even after he modified it to permit a limited reference to the use of tear gas) did not provide a complete basis for the jury to assess his mental and physical condition after the police removed him from the victim's house on September 8 and shortly before he confessed.

"[DEFENSE COUNSEL]: Your Honor, I'm going to take this moment just to object, to renew my original objection in limine regarding crisis negotiation.

"THE COURT: Understood."

King then testified about the negotiations during the standoff. He touched briefly on the length of the standoff, the officers' attempts to make contact with defendant, and their efforts to gain entry into the house. Sparling then testified briefly about entering the home after using a robot to determine defendant's location. Finally, Chamberlin described arresting defendant and taking him to the hospital. After Chamberlin stated that defendant had been taken to a hospital, the state asked, "[W]e heard that there was a lot of tear gas deployed, is that the reason for him to go to the hospital and be checked out?" Chamberlin said, "Correct." When asked whether defendant had tear gas on him, Chamberlin replied, "He was literally covered in tear gas. The white dust from the tear gas was just all over his body." During the officers' testimony, defendant did not object to any of King, Sparling, or Chamberlin's specific testimony about the standoff beyond renewing his pretrial motion *in limine* at the beginning of King's testimony.

Defendant assigns error to the trial court's ruling on his renewed pretrial motion. However, in stating "Understood" in response to defendant's renewed pretrial motion, the trial court did no more than it had done in ruling on the pretrial motion. The court reaffirmed the one aspect of its ruling that was final—it was not going to limit the state to defendant's proposed stipulation. It also reaffirmed what it had described as its preliminary ruling, which provided general advice to the parties about the way that the state should present its evidence (move quickly through it without focusing unduly on it) and during which the trial court advised defendant that it would exclude cumulative or unduly prejudicial testimony if objections were raised.

For the reasons explained above, the trial court did not err in declining to limit the state to defendant's proposed stipulation—the one part of the trial court's pretrial and midtrial ruling that was final. Because defendant renewed

his pretrial motion before any of the three witnesses testified about the events that occurred at the standoff, the remainder of the trial court's reaffirmation of its pretrial ruling was preliminary and cannot be challenged on appeal.

## C. *Defendant's Later OEC 403 Objection*

Chamberlin was the last of the three witnesses who testified about the standoff. As noted, he began by describing his arrest of defendant in the house and explaining why he took defendant to the hospital. That aspect of the standoff formed only a small part of Chamberlin's testimony. The remainder (and the majority) of Chamberlin's testimony focused on his interview with defendant the following day at the police station. Chamberlin recounted defendant's description of his daily drug use during that interview. He explained that defendant told him that he and the victim had separated because of his drug use, that defendant believed that the victim had been cheating on him, and that defendant said that "if he was sober, he would not have done the things that he did in his relationship with [the victim]." Chamberlin also recounted defendant's version of the events on August 9, August 22, and September 7, and Chamberlin explained that, when asked about the victim's version of the events, defendant said that he did not remember much of what the victim reported. Finally, Chamberlin read a letter of apology that defendant had written the victim at the police station. Defense counsel then cross-examined Chamberlin, and the state examined him on redirect.

After Chamberlin finished his testimony and was excused, the parties discussed with the trial court how to handle a juror's use of a cell phone during trial. Defendant then raised a question regarding medical records that had come to light for the first time during trial and argued that those records should be excluded and a mistrial granted because of the records' late appearance. After the trial court ruled against defendant on those matters (approximately 43 transcript pages after Chamberlin testified about arresting defendant during the standoff and why he took him to the hospital), defendant raised an OEC 403 "objection to the [specific] evidence about the SWAT team standoff." He told the trial court:

"There was excessive testimony about robots being deployed, tear gas being broken into the home, explosives blowing the door off. And then to sort of cap it all off, Detective Chamberlain said exactly what I was afraid he would, which is that he had never seen somebody handle that much gas before."

Defendant explained that, in his view, the three witnesses' testimony had "cross[ed] a line into unfair prejudice from 403 balancing." The state offered a different view of the evidence. It explained that the officers' testimony had been restrained and touched only briefly on the various ways in which the officers had tried to make contact with defendant before entering the home. After considering the parties' arguments, the trial court ruled, "I do not find that the amount of testimony was prejudicial or cumulative to the point of denying a fair trial."

The state argues that the trial court's ruling is correct on the merits. There is, however, a more fundamental problem with defendant's objection. It came too late. *See* OEC 103(1)(a) (requiring a timely objection or motion to strike). As the Supreme Court explained in *State v. Keller*, 315 Or 273, 283, 844 P2d 195 (1993):

"In order for a ruling on evidence to be considered as an assignment of error on appeal, a timely objection to, or motion to strike, the evidence must appear on the record. OEC 103(1)(a). An objection is 'timely' if it is made as soon as its applicability to the offered evidence is known to the opponent of the evidence. An objection need not necessarily be made to the first question in a series of foundation questions, because in that situation the court often will have no basis properly to assess the admissibility of the evidence."

(Footnote and citations omitted.)

In announcing its preliminary ruling on defendant's pretrial motion *in limine*, the trial court advised defendant that it would exclude specific evidence that was either cumulative or unduly prejudicial if objections were raised. Defendant, however, did not do so. He waited until long after the three witnesses had finished their testimony and been excused to object to the specific evidence they offered. A timely objection permits a trial court to correct

any error. By waiting until long after the specific evidence had been admitted, defendant waived any objection to it. *See Blanton v. Union Pacific Railroad Co.*, 289 Or 617, 623, 616 P2d 477 (1980) ("Normally, if improper evidence is offered, objection must be made at the time of the offer or it is deemed waived.").

We recognize that, early on, defendant raised a concern that evidence regarding the standoff could become either cumulative or unduly prejudicial. However, at the two points during the litigation when defendant raised that concern (pretrial and at the beginning of King's testimony), no specific evidence regarding the standoff was before the trial court, and the court made, for the most part, only a preliminary ruling. As the trial court explained, it was not excluding any evidence "at this point," and it advised the parties that, if defendant objected, it would exclude evidence if it became either cumulative or too prejudicial. Defendant, however, did not raise any objection to the specific evidence of the standoff that the state's three witnesses offered until long after those witnesses had been excused. As a result, defendant waived any objection he might have had to their specific testimony.

## II.   DEFENDANT'S THIRD ASSIGNMENT OF ERROR

After defense counsel unsuccessfully moved under OEC 403 to exclude the specific evidence that the state had offered regarding the standoff, the trial court asked counsel if he wished to make any other motion. Defense counsel stated:

> "I guess I should make a conclusion from what I just said about the—what I think was an excessive [amount of] evidence regarding the standoff, and that being unfairly prejudicial, that now that that's been heard by the jury, this is a new basis for a mistrial request."

The trial court ruled: "Okay. And so, [defense counsel], I am denying that motion as well."

On appeal, defendant assigns error to that ruling. The state responds that defendant's mistrial motion was untimely and that, in any event, the trial court did not

abuse its discretion in denying the motion. We agree with the state's first argument and do not reach the merits of the trial court's ruling. The Supreme Court has long recognized that, "[t]o preserve error, a motion for a mistrial must be timely," and that a motion is "timely if it is made when the allegedly objectionable statements were made." *State v. Walton*, 311 Or 223, 248, 809 P2d 81 (1991). There are exceptions to that rule. For instance, "'[w]here it is clear that the trial court understands that the defendant intends to seek a mistrial, and it responds by giving a curative instruction, the need for an *immediate* mistrial motion is obviated.'" *State v. Cox*, 272 Or App 390, 406, 359 P3d 257 (2015) (quoting *State v. Veatch*, 223 Or App 444, 453, 196 P3d 45 (2008) (emphasis in *Veatch*)).

In this case, defendant did not make an immediate motion to exclude the witnesses' specific testimony under OEC 403, much less a motion for a mistrial at that time. Much of the testimony that he viewed as objectionable evidence came from King, but he waited until after King, Sparling, and Chamberlin had testified and been excused before moving for a mistrial based on King's testimony. The other evidence he found objectionable was Chamberlin's (and perhaps Sparling's) testimony regarding tear gas. However, defendant's failure to raise a timely objection both waived his evidentiary objection and resulted in his mistrial motion being untimely. *See Blanton*, 289 Or at 623 (mistrial motion untimely in the absence of a timely evidentiary objection).

We accordingly affirm the rulings challenged in defendant's second and third assignments of error. As noted above, we have considered defendant's other assignments of error and reject them without further discussion.

Affirmed.